**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59689-0-II |
| Respondent, | |
| v. | |
| DOUGLAS RAY CLARK, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Following a jury trial, Douglas R. Clark appeals his convictions for attempted rape of a child in the second degree and communication with a minor for immoral purposes. Clark argues that the trial court violated his right to present a defense by denying him an entrapment jury instruction and his right to privacy was violated when the State used his refusal to consent to a cell phone search as substantive evidence of his guilt.

Because the record shows that prima facie evidence of entrapment was presented at trial, the trial court erred when it denied Clark's request for a jury instruction on entrapment. Also, the State violated Clark's constitutional right when it used evidence of his refusal to consent to a warrantless search of his cell phone as substantive evidence of guilt. Therefore, we reverse and remand for a new trial.[1]

---

[1] Clark also raised the following challenges in his appeal: (1) violation of his right to a jury trial when the State elicited an improper witness opinion on his guilt, (2) several instances of prosecutorial misconduct, (3) his indeterminate sentence constitutes cruel and unusual punishment, and (4) the trial court failed to tailor his community custody conditions. Because we reverse and remand for a new trial based on the jury instruction issue and the State's violation of Clark's constitutional rights by using evidence of Clark's refusal to consent to a warrantless search of his

FACTS

A.    BACKGROUND

On the afternoon of Saturday, November 12, 2022, 46-year-old Clark began messaging "Monica" on a dating app. 2 Verbatim Rep. of Proc. (VRP) (Apr. 18, 2024) at 706. Monica's profile indicated she was 19 years old. Monica's profile pictures showed a "young Hispanic female." 1 VRP (Apr. 16, 2024) at 328.

Unbeknownst to Clark, Monica was a fictitious person created by members of the Washington State Patrol's (WSP) Missing and Exploited Children Task Force (MECTF). The MECTF is a multi-jurisdictional task force that investigates violent crimes against and the exploitation of children. The MECTF periodically runs undercover operations to "find individuals [who] have a sexualized interest in children," often called "'Net Nanny'" operations. 1 VRP (Apr. 16, 2024) at 257. During an operation, members of the task force create several fake dating profiles and see who expresses interest in those profiles. Task force members pose as juveniles and chat with other dating app users. If MECTF members develop "some probable cause or . . . a suspicion that the individual they're talking to is interested in sexual activities with a minor," the MECTF launches an investigation, which may culminate in meeting and apprehending an individual. 1 VRP (Apr. 16, 2024) at 260.

After a brief exchange, Clark asked Monica, "What are you up to on here? Looking for friends or what?" Ex. 8, at 1. Monica did not immediately respond. Clark then messaged, "Would

---

cell phone as substantive evidence of guilt, we do not address Clark's additional challenges on appeal.

you chill with someone older?" Ex. 8, at 1. Monica replied, "lol yes i actually prefer older."[2] Ex. 8, at 1. Clark replied, "Great. When would you like to hangout?" Ex. 8, at 1.

Monica responded, "text me?" and provided a phone number for Clark to text directly. Ex. 8, at 1. Initially, Clark was hesitant to switch away from messaging on the dating app. Clark stated, "Why do we need to text so soon? Usually a red flag for me. We can chat on snap or kik first if you like."[3] Ex. 8, at 1. Monica replied: "lol u just asked me to hangout but texting too soon and i have like 50 other guys trying to message me on here." Ex. 8, at 2. Clark then agreed to begin texting Monica.

Clark and Monica's text conversation proceeded as follows:

| 2022/11/12 | 04:13:46 PM PST | Incoming[4] | Hi Monica |
|---|---|---|---|
| 2022/11/12 | 04:14:48 PM PST | Outgoing | *hii* ☺ |
| 2022/11/12 | 04:15:25 PM PST | Incoming | So what do you [sic] for fun around here? |
| 2022/11/12 | 04:15:33 PM PST | Outgoing | *wait u didnt tell me ur name lol* |
| 2022/11/12 | 04:15:38 PM PST | Outgoing | *guessing its cam?*[5] |
| 2022/11/12 | 04:15:44 PM PST | Incoming | Yes |
| 2022/11/12 | 04:16:41 PM PST | Incoming | Do you work? Go to school? |
| 2022/11/12 | 04:18:25 PM PST | Outgoing | *im just in school* |
| 2022/11/12 | 04:19:20 PM PST | Incoming | Ok. What days would be good to hangout? |
| 2022/11/12 | 04:20:56 PM PST | Outgoing | *im only here for the weekend so today or* |

---

[2] Several of the messages and text exchanges are written informally. This opinion will reflect the content of the messages without adjusting for grammar or spelling.

[3] Snapchat and Kik are other messaging or dating platforms.

[4] Clark's texts are identified as "[i]ncoming" messages while Monica's texts are noted as "[o]utgoing" messages. 2 VRP (Apr. 17, 2024) at 360.

[5] Clark went by the nickname, "'Cam.'" 2 VRP (Apr. 18, 2024) at 636.

| | | | |
|---|---|---|---|
| | | | *tomorrow would be best* |
| 2022/11/12 | 04:21:10 PM PST | Outgoing | *so i wanted to tell u in text not on the app that im not 18* |
| 2022/11/12 | 04:22:03 PM PST | Incoming | Would tomorrow night be okay? |
| 2022/11/12 | 04:23:12 PM PST | Incoming | Are you wanting to have sex with an older man? |
| 2022/11/12 | 04:23:51 PM PST | Outgoing | *i mean yeah i guess i don't like younger guys but im almost 13 is that a problem?* |
| 2022/11/12 | 04:24:40 PM PST | Incoming | Probably |

Ex. 9, at 1 (italics added). Monica informed Clark that she was from the Tri-Cities area but visiting her aunt in Chehalis for the weekend.

Clark then turned the conversation back to sex:

| | | | |
|---|---|---|---|
| 2022/11/12 | 04:25:52 PM PST | Incoming | Have you ever done anything before? |
| 2022/11/12 | 04:26:45 PM PST | Outgoing | *ya im not a virgin if thats what ur asking* |
| 2022/11/12 | 04:27:22 PM PST | Incoming | Does your aunt know? |
| 2022/11/12 | 04:27:57 PM PST | Outgoing | *nope she doesnt know i evne [sic] have a phone lol* |
| 2022/11/12 | 04:29:20 PM PST | Incoming | So how would we do this? Not saying we will, just asking. |
| 2022/11/12 | 04:31:11 PM PST | Outgoing | *idk u pick me up and go somewhere lol* |
| 2022/11/12 | 04:32:49 PM PST | Incoming | How many guys have said no when found out? |
| 2022/11/12 | 04:33:18 PM PST | Outgoing | *i dont tell many or meet with many lol most guys arent real or just want nudes* |
| 2022/11/12 | 04:33:53 PM PST | Incoming | So why me? |

| 2022/11/12 | 04:34:39 PM PST | Outgoing | *ur cute and probably have money lol* |
| 2022/11/12 | 04:35:18 PM PST | Incoming | Want to get paid? |
| 2022/11/12 | 04:35:41 PM PST | Outgoing | *oh no lol just like guys that can take me out and not be bums* |
| 2022/11/12 | 04:38:10 PM PST | Incoming | Not sure we'd ever go out, for a few reasons. And you're only here for the weekend |
| 2022/11/12 | 04:38:48 PM PST | Outgoing | *thats true but yeah older guys usually have a job and car lol not like boys my age* |
| 2022/11/12 | 04:40:39 PM PST | Incoming | Have you been with a lot of guys? |
| 2022/11/12 | 04:40:57 PM PST | Outgoing | *not like sex but ive dated a few* |
| 2022/11/12 | 04:41:34 PM PST | Incoming | Do you have a lot of sex back home? |
| 2022/11/12 | 04:41:58 PM PST | Outgoing | *no lol i was seeing a guy but we dont talk anymore* |

Ex 9, at 1-2 (italics added). Clark then texted:

| 2022/11/12 | 04:44:53 PM PST | Incoming | Why so interested in sex? |
| 2022/11/12 | 04:45:30 PM PST | Outgoing | *im not lol you asked about sex* |
| 2022/11/12 | 04:46:34 PM PST | Incoming | Ok. So we'd just be talking if we hung out? |
| 2022/11/12 | 04:48:42 PM PST | Outgoing | *if thats what u want* |
| 2022/11/12 | 04:49:41 PM PST | Incoming | You're good with that? |
| 2022/11/12 | 04:53:09 PM PST | Outgoing | *im down with whatever honestly* |

Ex. 9, at 2-3 (italics added).

5

Clark agreed to meet with Monica at 7:00 p.m. the following evening. When Monica asked what they would do, Clark replied, "Probably just talk. We can see tomorrow." Ex. 9, at 3. Clark continued to text Monica for another hour, asking about a location to meet, whether Monica would need to sneak out of her aunt's house, whether Monica's cousin knew that Monica was sexually active. Clark and Monica also exchanged photos of themselves.[6]

Clark then asked Monica what she had planned for the evening:

| 2022/11/12 | 05:44:25 PM PST | Incoming | So what are you doing tonight? Still looking for someone to do something else? |
|---|---|---|---|
| 2022/11/12 | 05:54:24 PM PST | Outgoing | *im still doing nothing not much to do here and yeah if someone is down i am* |
| 2022/11/12 | 05:55:28 PM PST | Incoming | They just have to be older, right? 😊 |
| 2022/11/12 | 06:00:05 PM PST | Outgoing | *lol ya dont want no boy* |
| 2022/11/12 | 06:01:32 PM PST | Incoming | Would you be happy just talking and hanging out? Or want more? |

Ex. 9, at 4-5 (italics added).

Monica did not respond to Clark's message at 6:01 p.m. because the MECTF officer posing as Monica had a family emergency and could no longer continue texting. Clark did not send any further texts that day.

---

[6] Monica's photo was a photo of a WSP trooper that was doctored to look as if the trooper was a minor.

The next day, at 7:40 p.m., Clark texted Monica, "Did you go out last night?" Ex. 9, at 5. A new MECTF officer had stepped in to pose as Monica. After a brief exchange, Clark and Monica texted as follows:

| 2022/11/13 | 07:53:14 PM PST | Incoming | What do you want to do? |
|---|---|---|---|
| 2022/11/13 | 07:54:27 PM PST | Outgoing | *i dont know what do you want to* |
| 2022/11/13 | 07:56:04 PM PST | Outgoing | *tell me what you would want to do with me* 😛 |
| 2022/11/13 | 07:58:04 PM PST | Incoming | We could just plan to talk and see what happens |
| 2022/11/13 | 07:58:20 PM PST | Incoming | What would you like to do to me? |
| 2022/11/13 | 08:00:08 PM PST | Outgoing | *talk? hmmmmmm what do you really want to do to me if we meet tonight. . . . . .u can tell me* |
| 2022/11/13 | 08:02:42 PM PST | Incoming | I'm not much of a chatter. If we met it would be to talk. And see what happens. |
| 2022/11/13 | 08:02:54 PM PST | Incoming | That's the best I can offer. |
| 2022/11/13 | 08:04:40 PM PST | Outgoing | *you must be real shy* |

Ex. 9, at 5 (italics added).

At 8:34 p.m., Clark asked, "So don't want to hangout?" Ex. 9, at 6. Monica replied, "up top [sic] u what you have planned for us besides talking." Ex. 9, at 6. Clark asked when Monica could get out and if she still needed to be picked up. Monica responded, "well if we are just going to talk we can do that here. If you want to do other stuff we can meet. ☺" Ex. 9, at 6. Clark then replied, "Ok, let's meet, if you want." Ex. 9, at 6.

Monica proceeded to ask Clark several questions, such as what they would do together and what she should wear. Clark responded with vague answers and told Monica, "Just dress normal. If we do something we can work to it." Ex. 9, at 6. Clark then requested to speak on the phone with Monica.

Around 10:00 p.m., Clark called Monica and spoke with a female undercover WSP trooper. They spoke for approximately six minutes. During the phone conversation, the trooper posing as Monica confirmed it was Clark who called, and she asked what to wear. Then the conversation turned to Clark's penis size.

> UC[7] – I can wear something special for tonight. What do you like?
>
> Cam[8] – Whatever you want. Are you just here for the weekend?
>
> UC – Yeah. I visit often because I have family in the area. Well I hope you don't mind that I'm not a virgin, for some guys that has mattered.
>
> Cam – That's fine.
>
> UC – Just in case do you think you'd be able to pick up condoms?
>
> Cam – Yeah.
>
> UC – What size do you think you'd be buying. The guys I was with in the past were average so I don't know if you were bigger if it might hurt.
>
> Cam – It's a pretty good size.
>
> UC – In that case we might need some lube. I can see if maybe my cousin has some too, but might need that.
>
> Cam – Yeah.

---

[7] "UC" stands for "[u]ndercover" and was the trooper posing as Monica. Ex. 19, at 1.

[8] As noted above, "Cam" is the name used by Clark in communicating with Monica.

Ex. 19, at 1.

Then, at 11:11 p.m., Monica texted Clark:

| 2022/11/13 | 11:11:27 PM PST | Outgoing | *k im ready there is an arco rite by my house can u let me know when u there then i send u my addy u can get the lube we talked bout there cant find my cousins* |
|---|---|---|---|
| 2022/11/13 | 11:18:39 PM PST | Incoming | Ok. On my way |
| 2022/11/13 | 11:25:37 PM PST | Outgoing | *k* |
| 2022/11/13 | 11:51:22 PM PST | Outgoing | *are u close* |
| 2022/11/13 | 11:54:18 PM PST | Incoming | On the freeway |
| 2022/11/14 | 12:07:12 AM PST | Incoming | No lube here |
| 2022/11/14 | 12:08:05 AM PST | Incoming | What's the address? |
| 2022/11/14 | 12:09:17 AM PST | Outgoing | *k well have to make it work i guess. i live across from Shaw Aquatic Center 401 SW Parkland Dr. its foggy out so when you pull into the parking lot flash your lights and i will walk across* |
| 2022/11/14 | 12:16:12 AM PST | Incoming | Ok |

Ex. 9, at 7 (italics added).

Clark drove to the aquatic center and then drove around the block before turning into the parking lot. Once in the parking lot, Clark flashed his headlights. However, after flashing his headlights, Clark became suspicious and decided to leave.

Several MECTF members had been stationed in unmarked vehicles near the aquatic center. The officers observed Clark drive around the block, enter the parking lot, and flash his headlights. After Clark had flashed his headlights, officers began to move towards Clark to arrest him. Before

the officers could detain Clark, however, Clark began to drive towards the freeway. Clark then turned into a sandwich shop parking lot. Law enforcement arrested Clark in that parking lot. It was approximately 12:30 a.m. on Monday, November 14.

Police searched Clark and found two condoms in his front pocket. Police also retrieved Clark's phone from his car. Police could see a test text that the MECTF member posing as Monica had sent to Clark's device, which verified that Clark was the individual communicating with Monica. However, the test text had been received by Clark's phone under a text thread titled, "'Maria-Bumble.'" 2 VRP (Apr. 18, 2024) at 666.

B. POLICE INTERVIEW

Detective Steven Perez and Detective Sergeant Brent McFarlane interviewed Clark. Detective Perez advised Clark of his *Miranda* rights. Clark acknowledged his understanding of his rights, and he stated that he was willing to speak with the detectives and signed a form stating the same. The interview was digitally recorded. Police advised Clark of the recording.

During the interview, Clark evidenced confusion. Clark told the detectives that he thought he was meeting "'Maria,'" a different woman he had been messaging for several days on Bumble, another dating app. According to Clark, Maria was a Hispanic woman, with black hair, in her early 30's, and who lived in Chehalis. Clark told the detectives he mistakenly saved Monica's number under Maria's contact information in his cell phone. When he began texting Monica on the evening November 13, he thought he was texting Maria and continuing a separate conversation. When Clark drove to the aquatic center, he believed he was meeting with Maria.

Detective Perez asked to look at Clark's cell phone to verify his account. Clark declined and stated that he wished to consult with an attorney before he consented to a search of his phone.

10

Detective Perez clarified that Clark only wanted an attorney as it related to a search of the cell phone but that Clark was still willing to talk. Clark confirmed he was still willing to speak with the detectives; Clark just did not "want to consent to the police going through his phone." Clerk's Papers (CP) at 15. Later, Clark requested an attorney and the interview ended.

C.    CHARGES AND TRIAL

The State charged Clark with second degree attempted rape of a child (Count I) and communication with a minor for immoral purposes (Count II).

The case proceeded to a multi-day jury trial in April 2024. Several witnesses, including Clark, testified to the facts described above.

1.    Detective Perez Testimony

Detective Perez testified to his background, his involvement with MECTF, and his involvement generally in the November 2022 operation. Then, through Detective Perez, the State introduced Exhibit 18, a CD containing the recording of Clark's interview with Detective Perez and Detective McFarlane immediately following Clark's arrest. The State then played the entirety of Exhibit 18 for the jury.

During cross-examination, defense counsel asked Detective Perez about Clark's claim that he thought he was texting Maria instead of Monica and that he had mixed up the phone numbers. Detective Perez confirmed that Clark told him about the alleged mix-up. Defense counsel also addressed Detective Perez's request to search Clark's cell phone.

> [DEFENSE COUNSEL:] Okay. So he initially told you, when you asked well, let's look at your phone; right? And that's something I'm assuming you do typically, right, in these kinds of cases?
>
> [PEREZ:] It's another technique.

11

[DEFENSE COUNSEL:] Yeah.  And some people say, "yes," some people say, "no," but it's--you have to ask; right?

[PEREZ:] Absolutely.

[DEFENSE COUNSEL:] And the purpose of that, obviously, is to review all of the text messages and review all of the statements being made to confirm that this phone is attached to this conversation; right?

[PEREZ:] Among other things, yes.

[DEFENSE COUNSEL:] Yeah.  Among other things, you need to look through the phone for any other potential incriminating information?

[PEREZ:] With consent, sure.  Why not?

[DEFENSE COUNSEL:] Okay.  So he said that he would not consent for you to go through his phone unless, obviously, he was advised by a lawyer before doing so; right?

[PEREZ:] That's correct.

[DEFENSE COUNSEL:] Okay.  Because that is a search; right?

[PEREZ:] Absolutely.

[DEFENSE COUNSEL:] So unless a person consents, you're required to put together an application or a statement of probable cause to a judge in order to ask for a warrant to search; correct?

[PEREZ:] That is correct.

2 VRP (Apr. 18, 2024) at 661-62.

2.      Detective McFarlane testimony

Detective McFarlane testified similarly to Detective Perez regarding the police interview with Clark.  Detective McFarlane testified that Clark stated he had intended to meet with Maria, but that Clark had confused Maria's phone number with Monica's.  Detective McFarlane stated

12

that in his experience, he had seen suspects in criminal investigations intentionally enter incorrect contact information in their phones.

The State then inquired about Detective Perez's request to look at Clark's phone:

[STATE:] Now, at some point in time, the subject came up of whether Mr. Clark would allow the officers—you and Detective Perez—to look in his cell phone. Did Mr. Clark indicate to you that he didn't want that to occur at that time?

[MCFARLANE:] Yes.

[STATE:] And he—he was concerned about what was on his phone.

Do you remember him talking about that?

[MCFARLANE:] I believe so, yes.

2 VRP (Apr. 18, 2024) at 689. On redirect examination of Detective McFarlane, the State again inquired about the request to search Clark's phone:

[STATE:] Okay. And you had asked him if—or I think it was Detective Perez asked him, if they could look in his phone to prove this?

[MCFARLANE:] Yes.

[STATE:] And he declined that?

[MCFARLANE:] Yes.

2 VRP (Apr. 18, 2024) at 699.

3.      Clark testimony

Clark testified in his defense. Clark testified that he had previously been married for over 10 years. Clark had a daughter who passed away in 2010. Following his daughter's passing, Clark became depressed and his marriage fell apart.

After Clark and his wife divorced, he was "extremely bored, lonely, and depressed." 2 VRP (Apr. 18, 2024) at 702. He began chatting with people on multiple dating websites and apps "trying to find people to talk to." 2 VRP (Apr. 18, 2024) at 702. Clark testified that doing so became an addiction for him such that he would message with people on the dating apps "almost 24/7." 2 VRP (Apr. 18, 2024) at 703.

Clark stated that on November 12, 2022, he had been chatting with 10 or 15 people simultaneously on various dating apps. Clark saw Monica's profile and he found her attractive, so he began messaging her. Based on Monica's responses, Clark believed that Monica showed interest in him.

When Monica asked Clark to switch to texting instead of messaging on the app, Clark was hesitant to do so. However, because Monica told him, "'I've got 50 other guys that I'm talking with,'" Clark felt pressured to switch to texting and continue the conversation. 2 VRP (Apr. 18, 2024) at 709. Clark stated that Monica's request was a "red flag" to him, but he was also bored and lonely and "just wanted [somebody] to. . . continue talking to." 2 VRP (Apr. 18, 2024) at 709.

Clark testified that when Monica told him she was 12, he "didn't believe anymore, basically, anything that they were saying at this point." 2 VRP (Apr. 18, 2024) at 712. Clark believed someone was "trolling [him] or just another bot or somebody just trying to get something from [him]." 2 VRP (Apr. 18, 2024) at 712-13. However, he continued to text because he was bored and curious. According to Clark, he never believed he was texting with an actual 12-year-old, nor did he have any intention of meeting up with Monica despite their text exchange.

Clark stated that after Monica stopped texting on November 12, he went back onto the dating app to block Monica. However, he noticed that her profile was gone and assumed that someone else had reported Monica to the dating site or that Monica had deleted her account.

Clark testified that he had been chatting with multiple people while he had been messaging with Monica, including a woman named Maria on the Bumble dating app. Clark stated that on November 12, he and Maria had exchanged phone numbers because they had discussed meeting up. However, he inadvertently saved Monica's phone number under Maria's contact information in his phone. Accordingly, on November 13, when he re-initiated contact with Monica, Clark believed he was reaching out to Maria. Clark testified that on November 13, when he initiated the discussion with "'Did you go out last night?,'" it was a continuation of a conversation with Maria. 2 VRP (Apr. 18, 2024) at 719.

Clark also testified that his November 13 conversation turned to a sexual nature. According to Clark, his prior conversations with Maria had not been sexual, and Clark continued to respond that he "just want[ed] to talk." 2 VRP (Apr. 18, 2024) at 721. Clark stated he wanted to verify that Maria was a real person and requested to speak on the phone. Clark also stated that a woman who fit Maria's profile—that of a 30-year-old woman—answered the phone and "the woman on the phone sounded like probably a 30-year-old woman." 2 VRP (Apr. 18, 2024) at 726. The woman on the phone never said her name and Clark assumed it was Maria.

Upon speaking with whom he believed was Maria, "she immediately was . . . wanting to . . . meet to have sex, and was kind of pushing . . . that's what she wanted to do, and . . . made multiple suggestions towards that." 2 VRP (Apr. 18, 2024) at 727. Clark testified that he never thought at any point he was speaking with a 12-year-old and he had not thought much about the

15

woman's mention of sneaking out of her aunt's house. According to Clark, he had forgotten about his conversation with Monica as it had occurred over 24 hours prior.

Clark testified that he followed the instructions to go to the aquatic center. Clark stated that he had wanted potato chips and an energy drink, so he first stopped at a gas station near his house. That gas station did not have what he wanted, so he went to a second gas station near his house, which did not have the items either. Finally, Clark went to the gas station that Monica had directed him to, to buy chips. Clark testified that he never looked for lube at the gas station and never intended to purchase any. When he texted, "'No lube here,'" he simply meant that he did not have any. 2 VRP (Apr. 18, 2024) at 732.

Clark also testified that as he drove to the aquatic center, it was foggy and he became lost, so he needed to turn around and circle back to the parking lot. Clark stated that once he pulled into the aquatic center parking lot and flashed his headlights, things "didn't seem right," so he "changed [his] mind and left." 2 VRP (Apr. 18, 2024) at 734.

Clark further testified that when he was arrested, he did not initially realize what exactly he had been arrested for. Then, partway through his police interview, he realized that Monica was a 12- or 13-year-old instead of someone trolling him, like he had believed. Clark stated that his demeanor had changed during the interview because he began to understand the severity of the situation.

On cross-examination, the prosecutor pressed Clark on his text responses to Monica and his desire to meet with her on November 12. Clark acknowledged he was the first to bring up sex in the November 12 conversation.

16

The prosecutor also cross-examined Clark regarding his text exchange with Monica about her sneaking out of her aunt's house.

> [STATE:] So, again, you're evidencing knowledge that this is a minor and she has to sneak out of her aunt's house when she goes to sleep; right?
>
> [CLARK:] No. I was questioning why you would have to sneak out of her aunt's house.
>
> [STATE:] No, no. You didn't say, "why." You didn't say, "Why do you have to sneak out of your aunt's house?" It doesn't say that, does it?
>
> [CLARK:] No.
>
> [STATE:] Okay. You're a manager, you have an important job. You know how to communicate, do you not?
>
> [CLARK:] Yes.

2 VRP (Apr. 18, 2024) at 802-03.

Finally, the prosecutor inquired about the police interview following Clark's arrest and the detectives' request to look at Clark's phone to verify his version of events:

> [STATE:] Okay. Remember when the officer said, "Well, we can set this all straight. Let's open up your phone," what did you say?
>
> [CLARK:] I said no.
>
> [STATE:] Yeah, so that—"I don't know what's in there," is what you said.
>
> [CLARK:] (Nods head.)
>
> [STATE:] How come you don't know what's on your phone?
>
> [CLARK:] Well, looking back now, I wish I hadn't, you know, had any conversations without my attorney, but I didn't want anybody going through my phone because I didn't want anybody to--it's my personal phone.
>
> [STATE:] But this was going to clear it all up. You said, "It's just a simple mistake." It's going to clear it all up.

17

[DEFENSE COUNSEL]: Objection, Your Honor; it's not a question.

[COURT]: Sustained.

[STATE:] Didn't you think that that could clear it up?

[CLARK:] At the time they'd asked, I was realizing the situation and what was going on, and at that point that's why I did not want to speak with them anymore at that time because I was confused as to what was going on and was not clear as to what was, you know—

[STATE:] Let's be clear; you didn't—we're talking about when they asked if they could search your phone. You said you were all right continuing to speak with them, you just didn't want them to search your phone. Remember that?

[CLARK:] Yes.

[STATE:] Okay. Because you said something different just a second ago, and I want to be clear. They asked to search your phone, you said no, but you voluntarily agreed to speak with them further?

[CLARK:] Yes.

3 VRP (Apr. 19, 2024) at 857-58.

4.      Jury Instructions

After the defense rested, the parties discussed jury instructions with the trial court. Clark requested an entrapment defense instruction. The State objected. The State argued that Clark's testimony had nothing to do with entrapment and that Clark instead testified that the whole circumstance was a mistake. In response, defense counsel argued that an entrapment defense instruction should be included because there was evidence of inducement, and ultimately whether there was sufficient evidence to support entrapment was up to the jury.

The trial court agreed with the State and denied Clark's request for an entrapment instruction. The trial court stated:

18

But here where we have the testimony of [Clark] himself indicating that he was not—he was—this is all either confusion or he was trolling, and . . . he really has eliminated in his testimony on cross-examination and to some extent on redirect examination that he didn't think he was meeting up with an underaged person. And even if the jury ends up not believing that, that's been his position during this trial and that's been his testimony, that this is all confusion and he thought he was meeting up with a different person who was not underaged.

So under those circumstances, especially when that has come from his own mouth under--mostly under cross-examination but also under direct examination, that it was his intention, he was discussing sex with a person. And whether he indicates that it was Monica or at some point he believed it was Maria, there's nothing that indicates the elements that this would lend itself, even under a reading which I'm required to do of the facts in favor of the defendant, in the light most favorable to the defendant. I don't see that based on his own testimony that those facts read in a light most favorable to him would support the giving of this—these instructions that were proposed, so I'm not going to give the entrapment instruction.

3 VRP (Apr. 19, 2024) at 891-92.

5.      Closing and rebuttal arguments

During the State's closing argument, the prosecutor discussed the evidence. The prosecutor then offered the State's interpretation of the testimony regarding law enforcement's request to search Clark's cell phone:

[STATE]: "I don't know what's on my phone." 46-year-old man, I mean, doesn't know what's on his phone, doesn't want the police to look. "Would you let us verify that?" "No; no." And you saw his body language, like "Ughh." All right.

3 VRP (Apr. 19, 2024) at 963.

6.      Verdict and Sentencing

The jury found Clark guilty on both counts. The trial court imposed a mid-range minimum sentence of 89 months to life on Count I and 12 months on Count II, with both sentences to be served concurrently. Additionally, the trial court imposed lifetime community custody.

19

Clark appeals.

ANALYSIS

On appeal, Clark argues that the trial court violated his right to present a defense by denying him an entrapment jury instruction and his right to privacy was violated when the State used his refusal to consent to a cell phone search as substantive evidence of his guilt. We agree.[9]

A.    JURY INSTRUCTION ON ENTRAPMENT

1.    Legal Principles

Defendants are "'entitled to have the jury instructed on [their] theory of the case if there [was] evidence to support that theory.'" *State v. Fisher*, 185 Wn.2d 836, 848, 374 P.3d 1185 (2016) (second bracket in original) (quoting *State v. Williams*, 132 Wn.2d 248, 259, 937 P.2d 1052 (1997)). In Washington, entrapment is a statutory affirmative defense. RCW 9A.16.070; *State v. Arbogast*, 199 Wn.2d 356, 366, 506 P.3d 1238 (2022).

RCW 9A.16.070 provides:

(1) In any prosecution for a crime, it is a defense that:
        (a) The criminal design originated in the mind of law enforcement
officials, or any person acting under their direction, and
        (b) The actor was lured or induced to commit a crime which the actor had
not otherwise intended to commit.
        (2) The defense of entrapment is not established by a showing only that law
enforcement officials merely afforded the actor an opportunity to commit a crime.

---

[9] As noted above, because we reverse based on the jury instruction issue and the State's violation of Clark's constitutional right to not have evidence of his refusal to allow a warrantless search of his cell phone used as substantive evidence of guilt, we do not address Clark's other challenges on appeal.

To obtain an entrapment instruction, a defendant must make a prima facie showing of the two elements found under RCW 9A.16.070(1)—inducement and predisposition. *Arbogast*, 199 Wn.2d at 360.

"Inducement evidence may be based on persuasion, fraudulent representations, threats, coercion, harassment, promises of reward, pleas based on need, and sympathy or friendship." *Id.* at 375. For there to be inducement, there must be more than simply the opportunity for the defendant to commit an offense; there "must be opportunity 'plus' something else." *Id.* at 377 (quoting *United States v. Poehlman*, 217 F.3d 692, 701 (9th Cir. 2000)). "'[E]ven very subtle governmental pressure, if skillfully applied, can amount to inducement.'" *Id.* (quoting *Poehlman*, 217 F.3d at 701).

Predisposition considers the defendant's intent. *Id.* at 379. "The relevant inquiry for an entrapment defense is whether a fact finder could reasonably conclude from the evidence that the defendant had no predisposition to commit the crime until the intent was implanted in his or her mind by police and that the defendant was induced to commit the crime through fundamentally unfair efforts by law enforcement." *Id.* This is a broad inquiry and considers aspects of the defendant's character and criminal history. *Id.*

A prima facie showing "is whether the evidence offered, considered in a light most favorable to the defendant, is sufficient to permit a reasonable juror to find entrapment by a preponderance of the evidence." *Id.* at 360. The Washington Supreme Court has further defined a prima facie showing as "some evidence supporting the proposition." *Id.* at 370.

"This evidence may come from 'whatever source' that tends to show that the defendant is entitled to the instruction." *Fisher*, 185 Wn.2d at 849 (quoting *State v. McCullum*, 98 Wn.2d 484,

488, 656 P.2d 1064 (1983) (plurality opinion)). Because a defendant is entitled to the benefit of *all* the evidence, the defense may be based on contradictory evidence or evidence inconsistent with the defendant's own testimony. *Id.* As long as there is some evidence supporting the defendant's theory, failure to give an instruction on an affirmative defense is reversible error. *Id.* at 848-49.

"We review de novo a trial court's refusal to provide a requested jury instruction where the refusal is based on a ruling of law." *Arbogast*, 199 Wn.2d at 365. Where a trial court's refusal to provide a jury instruction is based on factual reasons, courts review the trial court's ruling for abuse of discretion. *Id.*

      2.      Clark Entitled to Jury Instruction on Entrapment

          a.      Prima facie evidence of inducement and predisposition

Clark argues the trial court erred in denying him an entrapment instruction because it erroneously believed Clark was barred from presenting inconsistent theories at trial. The State concedes that the trial court employed the wrong analysis to deny Clark an entrapment instruction but argues that Clark was not entitled to an entrapment instruction regardless. We agree with Clark.

The trial court denied Clark's request for an entrapment instruction based solely on Clark's testimony. This was error. Clark is entitled to the benefit of all the evidence, even if that evidence is inconsistent with his own testimony. *Fisher*, 185 Wn.2d at 849. Because the trial court's ruling was based on a misunderstanding of the law, we review the refusal to give an entrapment instruction de novo. *Arbogast*, 199 Wn.2d at 365.

Here, when considering whether Clark made a prima facie showing of the elements of entrapment, the trial court analyzed only Clark's testimony:

And whether [Clark] indicates that it was Monica or at some point he believed it was Maria, there's nothing that indicates the elements that this would lend itself, even under a reading which I'm required to do of the facts in favor of the defendant, in the light most favorable to the defendant. I don't see that based on his own testimony that those facts read in a light most favorable to him would support the giving of this—these instructions that were proposed, so I'm not going to give the entrapment instruction.

3 VRP (Apr. 19, 2024) at 891-92.

However, evidence of the elements may come from "'whatever source' that tends to show that the defendant is entitled to the instruction." *Fisher*, 185 Wn.2d at 849 (quoting *McCullum*, 98 Wn.2d at 488). Furthermore, there only need be "some evidence" of inducement and predisposition. *Arbogast*, 199 Wn.2d at 370.

As for evidence of inducement, the record includes screenshots and transcripts of the conversations that occurred between Clark and Monica, both on November 12 and November 13. During the conversations on November 12, Clark continued to chat with Monica after she told him she was a minor and Clark asked Monica sex-related questions. However, Clark later repeatedly stated that he only wanted to meet up and talk:

| 2022/11/12 | 04:46:34 PM PST | Incoming | Ok. So we'd just be talking if we hung out? |
| 2022/11/12 | 04:48:42 PM PST | Outgoing | *if thats what u want* |
| 2022/11/12 | 04:49:41 PM PST | Incoming | You're good with that? |
| 2022/11/12 | 04:53:09 PM PST | Outgoing | *im down with whatever honestly* |

Ex. 9, at 3 (italics added).

| 2022/11/12 | 06:00:05 PM PST | Outgoing | *lol ya dont want no boy* |
| 2022/11/12 | 06:01:32 PM PST | Incoming | Would you be happy just talking and |

| | | | hanging out? Or want more? |
|---|---|---|---|

Ex. 9, at 5 (italics added).

On November 13, in Clark's text messages to Monica (or Maria, as Clark allegedly believed), Clark reiterated his desire to talk, stating: "If we met it would be to talk. And see what happens." Ex. 9, at 5. Even when prompted by Monica with the message, "tell me what you would want to do with me 😜," Clark responded with "We could just plan to talk and see what happens." Ex. 9, at 5. Moreover, Clark testified repeatedly that he was bored, lonely, and depressed following the death of his daughter and his divorce. Clark also testified that he developed an unhealthy addiction to dating websites, wanting to "reach[] out to anybody online that wanted to talk." 2 VRP (Apr. 18, 2024) at 704.

The record also shows that Clark was initially hesitant to exchange phone numbers with Monica. When Monica messaged Clark, "lol u just asked me to hangout but texting too soon and i have like 50 other guys trying to message me on here," Clark testified that he felt pressured to text her and continue the conversation. Ex. 8, at 2. While Monica's message in and of itself does not appear to apply an undue amount of pressure on Clark and was before Clark was aware of Monica's age, for someone experiencing profound depression, loneliness, and an unhealthy addiction, a reasonable juror could find there was a promise of friendship or sympathy if Clark switched to texting. *Arbogast*, 199 Wn.2d at 375.

Additionally, on November 13 and after Clark was aware of Monica's age, there was a marked difference in the tone of Monica's communications with Clark after the MECTF member posing as Monica had changed. Monica initiated messages implying sex, such as, "tell me what

24

you would want to do with me 😜 ," and "talk? hmmmmmm what do you really want to do to me if we meet tonight . . . . . . u can tell me." Ex. 9, at 5. When Clark asked Monica, "So don't want to hangout?" Monica replied, "up [to] u what you have planned for us besides talking," which suggests that she would not have been willing to meet up unless something beyond talking occurred. Ex. 9, at 6. Monica then explicitly stated she would not meet unless there was more: "well if we are just going to talk we can do that here. If you want to do other stuff we can meet. ☺." Ex. 9, at 6. Again, while Monica's messages do not apply overt pressure, there is still some pressure, and even subtle pressure can amount to inducement. *Arbogast*, 199 Wn.2d at 377. Given the evidence of Clark's particular mental state, and viewing the evidence in a light most favorable to Clark, the record shows "some evidence" of inducement. *Id.* at 370.

As to Clark's predisposition, the record shows that Clark had no criminal record. When Clark first contacted Monica, he believed he was contacting a 19-year-old woman. After Monica shared that she was 12 years old, Clark texted, "Not sure we'd ever go out, for a few reasons." Ex. 9, at 2. And as described above, Clark testified to experiencing loneliness and depression, making him particularly vulnerable to individuals who appeared to express interest in him. Clark also testified that he initially believed Monica was legitimately interested in him as a person because she would respond to his messages immediately and told him he was handsome, which had been uncommon in his experience. Additionally, Clark testified that when he drove to the aquatic center, he believed he was meeting Maria, a 30-year-old woman. Based on these factors, and viewing the evidence in a light most favorable to Clark, there was "some evidence" that Clark did not have the predisposition to meet with a 12-year-old. *Arbogast*, 199 Wn.2d at 379.

Thus, because there is "some evidence" of inducement and "some evidence" that Clark was not predisposed to commit the offense, Clark was entitled to a jury instruction on entrapment.[10] Accordingly, it was error for the trial court to deny Clark's request for a jury instruction on entrapment.

### b. Not harmless error

Clark appears to argue the trial court's refusal to give a jury instruction on entrapment was not harmless error because the error violated his right to present a defense by "fundamentally undermin[ing] his right to challenge the case against him." Br. of Appellant at 44. The State does not directly address Clark's harmless error argument.[11] We agree with Clark.

An instructional error may be harmless if it "was not prejudicial to the substantial rights of the party assigning it; and did not affect the final outcome of the case." *Arbogast*, 199 Wn.2d at 382. Because "[o]nly a jury can decide whether a defendant has met his burden of proving an affirmative defense by a preponderance of the evidence," here, the State must establish beyond a reasonable doubt that a jury would have reached the same result absent the error. *State v. Arbogast*, 15 Wn. App. 2d 851, 873, 478 P.3d 115 (2020), *aff'd*, 199 Wn.2d 356, 506 P.3d 1238 (2022); *State v. Quaale*, 182 Wn.2d 191, 202, 340 P.3d 213 (2014).

---

[10] Whether Clark could have *proved* entrapment by a preponderance of the evidence is a different matter altogether and ultimately a decision for the jury. *Id.* at 361.

[11] Rather, the State argues that even if the trial court employed the "wrong analysis" in concluding that Clark was not entitled to a jury instruction on entrapment, the trial court was nonetheless correct because Clark did not make a prima facie showing that he was entitled to the jury instruction. Br. of Resp't at 34. As discussed above, we conclude that Clark did make a prima facie showing that he was entitled to the instruction on entrapment.

For the reasons discussed above, Clark was entitled to an entrapment instruction. The trial court's denial of the instruction precluded Clark from arguing a desired defense, for which there was some evidence to at least warrant the instruction. Without the instruction, the jury could not apply the elements of entrapment to the evidence and was left with a constrained view of the applicable law. *Arbogast*, 199 Wn.2d at 382. Given that the State does not address Clark's harmless error argument, the State has not established *beyond a reasonable doubt* that "any reasonable jury would have reached the same result absent the error" (i.e., a reasonable jury would not have found that Clark had proven the statutory affirmative defense of entrapment). *Quaale*, 182 Wn.2d at 202. Thus, the trial court's refusal to give Clark's entrapment instruction was not harmless.

B.      EVIDENCE OF REQUEST TO SEARCH CELL PHONE

1.      Legal Principles

An individual has the right to refuse to consent to warrantless searches. *See State v. Gauthier*, 174 Wn. App. 257, 263, 298 P.3d 126 (2013); U.S. CONST. amend. IV. If a defendant invokes this constitutional right, that invocation is not admissible as substantive evidence of the defendant's guilt. *Gauthier*, 174 Wn. App. at 267. This is because the exercise of such a right is ambiguous. *Id.* at 264-65. "Exercising the right to refuse consent to a warrantless search may have nothing to do with hiding guilt" and the jury "should not be allowed to infer guilt in such ambiguous circumstances." *Id.* at 265. The admission of such evidence constitutes reversible error. *State v. Burke*, 163 Wn.2d 204, 206, 181 P.3d 1 (2008).

Generally, appellate courts will not consider issues raised for the first time on appeal. RAP 2.5(a)(3); *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). However, a party may

raise an error for the first time on appeal if it is a manifest error affecting a constitutional right. *Kirkman*, 159 Wn.2d at 926. Washington courts have held that the State's use of a defendant's invocation of the right to refuse a warrantless search as substantive evidence of guilt is a manifest constitutional error properly raised for the first time on appeal. *Gauthier*, 174 Wn. App. at 267.

2.      State Impermissibly Commented on Clark's Refusal of a Warrantless Search

Clark argues that the State improperly elicited evidence that Clark refused to allow the police to search his cell phone and used that refusal as substantive evidence of his guilt. The State argues that Clark "opened the door" to the State's inquiry and that this court should decline to consider this issue because Clark raises it for the first time on appeal and fails to show manifest constitutional error. Br. of Resp't at 14. The State further argues that even if there was an improper comment on Clark's exercise of his constitutional right to privacy, it was harmless beyond a reasonable doubt. We agree with Clark.

During Clark's interview with Detective Perez and Detective McFarlane, Detective Perez asked to search Clark's cell phone to verify Clark's version of events—that Clark had mixed up Monica's number with Maria's number. Clark declined and stated that he wished to consult with an attorney before he consented to a search of his cell phone.

Here, the record clearly shows that in the instances where the State elicited witness testimony regarding the request to do a cell phone search, the State used Clark's exercise of his constitutional right to refuse such a search to imply Clark had something to hide. *See Gauthier*, 174 Wn. App. at 265. When examining Detective McFarlane, the State commented with an interpretation of Clark's refusal: "[H]e was concerned about what was on his phone." 2 VRP (Apr. 18, 2024) at 689. Detective McFarlane agreed with the comment. During Clark's cross-

28

examination, the State peppered Clark with questions and commentary regarding the cell phone search, with remarks such as: "How come you don't know what's on your phone?"; "But this was going to clear it all up. You said, 'It's just a simple mistake.' It's going to clear it all up"; and "Didn't you think that that could clear it up?" 3 VRP (Apr. 19, 2024) at 857. Finally, the State emphasized Clark's refusal to allow a cell phone search in its rebuttal closing argument by replaying the specific portion of the interview footage where Clark declined the cell phone search, then stated: "46-year-old man, I mean, doesn't know what's on his phone, doesn't want the police to look. 'Would you let us verify that?' 'No; no.' And you saw his body language, like 'Ughh.'" 3 VRP (Apr. 19, 2024) at 963.

Because the State emphasized that Clark did not allow a search of his cell phone, that Clark's claim that he did not know what was on his cell phone was specious, and that Clark could have "clear[ed] . . . up" a "simple mistake" by allowing a cell phone search, the State inferred Clark's guilt based on his exercise of a constitutional right. *Gauthier*, 174 Wn. App. at 265; *Kirkman*, 159 Wn.2d at 926-27. Thus, Clark has shown a manifest constitutional error that may properly be raised for the first time on appeal. *Gauthier*, 174 Wn. App. at 267; RAP 2.5(a)(3).

The State argues that defense counsel "opened the door"[12] to the State's "further inquiry." Br. of Resp't at 14. The State is correct that on defense counsel's cross-examination of Detective Perez, before the State elicited any witness testimony about the cell phone search, defense counsel inquired about the cell phone search. However, the State neglects to address that prior to *any*

---

[12] The "open door doctrine" is a "theory of expanded relevance" that "permits a court to admit evidence on a topic that would normally be excluded for reasons of policy or undue prejudice when raised by the party who would ordinarily benefit from exclusion." *State v. Rushworth*, 12 Wn. App. 2d 466, 473, 458 P.3d 1192 (2020).

29

witness testimony regarding the phone search, the State introduced Exhibit 18, the video recording of Clark's police interview, which included video and audio footage of Detective Perez requesting to look at Clark's cell phone and Clark declining.

Exhibit 18 was admitted and published to the jury.[13] Although Clark's response to the requested cell phone search was not explicitly called to the attention of the jury when Exhibit 18 was first published, the fact remains that the State first introduced the cell phone search evidence through the admission of Exhibit 18. Thus, the State's argument that Clark "opened the door" is unavailing. Indeed, if anything, the record shows that defense counsel's line of questioning to Detective Perez regarding the cell phone search was likely to add context for why Clark may have chosen not to allow the police to search his cell phone—simply that police cannot conduct a search without a warrant.

The State used evidence of Clark's refusal to allow police to search his cell phone as substantive evidence of his guilt. This violated Clark's constitutional right to refuse to consent to warrantless searches.

3.      Error Not Harmless

"A constitutional error is harmless only if the reviewing court is convinced beyond a reasonable doubt that any reasonable jury would reach the same result absent the error and where the untainted evidence is so overwhelming it necessarily leads to a finding of guilt." *Burke*, 163 Wn.2d at 222. Under this test, the reviewing court must consider "*both* (1) the strength of the

_____

[13] While Exhibit 18 was not designated in the record on appeal, it is undisputed that the portion of the interview published to the jury included Detective Perez requesting to look at Clark's cell phone and Clark wishing to consult with an attorney before allowing police to do so.

properly admitted evidence of guilt *as well as* (2) the inculpatory or prejudicial impact of the unconstitutionally admitted evidence on even the properly admitted evidence." *State v. Magaña Arévalo*, 5 Wn.3d 781, 786-87, 582 P.3d 330 (2026) (emphasis in original). "Where the error is not harmless, the defendant must have a new trial." *Gauthier*, 174 Wn. App. at 270.

The State argues that there was significant untainted evidence that still leads to a finding of Clark's guilt. The State points to the text conversations between Clark and Monica; that Clark asked Monica about sex several times; the undercover phone conversation between Clark and Monica discussing lube and Clark's penis size; and the references to Monica needing to sneak out of her aunt's house, which would not have made sense for a 30-year-old woman. The record also shows that Clark went so far as to drive to the aquatic center and flash his headlights. Additionally, the arresting officers found condoms in Clark's pocket.

However, Clark's defense was that he thought he was meeting Maria, a 30-year-old woman, instead of Monica, a 12-year-old girl. According to Clark, the entirety of his text conversation on November 13 was based on the assumption he was communicating with Maria. Clark testified that he firmly believed he was speaking with Maria with on the phone—wherein the discussion of lube and penis size occurred—and she sounded as if she was about 30 years old. Thus, in large part, despite the untainted evidence, the trial boiled down to whether or not the jury believed Clark—if he was truly at the aquatic center to meet a 30-year-old woman, then he was not committing any offense. Clark alleged the mix-up occurred because he saved the wrong phone number.

No. 59689-0-II

Based on the record on appeal, we are not convinced beyond a reasonable doubt that any reasonable jury would reach the same result absent the error nor was the untainted evidence so overwhelming it necessarily leads to a finding of guilt. Thus, the error was not harmless.

CONCLUSION

The trial court erred by denying Clark's request for a jury instruction on entrapment. Also, the State violated Clark's constitutional right to not have evidence of his refusal to consent to a warrantless search of his cell phone used as substantive evidence of guilt. Therefore, we reverse and remand for new trial.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Ize, J.

We concur:

_____
Veljacic, C.J.

_____
Che, J.